**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

**DAWNN SUE CHILDERS WEBB,**

   **Plaintiff,**

**v.**           **CASE NO. 2:10-cv-01035**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   **Defendant.**

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Dawnn Sue Childers Webb (hereinafter referred to as "Claimant"), filed an application for DIB on April 30, 2007, alleging disability as of June 1, 1998, due to spinal fusion, foot drop, arthritis in lower back, spondylolisthesis, nerve damage in lower back, degenerative disc disorder, and depression. (Tr. at 10, 133-40, 170-80, 198-204, 208-14.) The claim was denied initially and upon reconsideration. (Tr. at 10, 60-64, 75-77.) On September 7, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 79.) The hearing was held on May 28, 2008 before the Honorable Charlie Paul Andrus.

(Tr. at 29-57, 86.)  A supplemental hearing was held on October 29, 2008 before the Honorable Charlie Paul Andrus.  (Tr. at 19-28, 107.)  By decision dated March 11, 2009, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 10-18.)  The ALJ's decision became the final decision of the Commissioner on June 17, 2010, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-4.)  On August 20, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe

2

impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. <u>Id.</u> § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. <u>Id.</u> If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. <u>Id.</u> §§ 404.1520(e). By satisfying inquiry four, the claimant establishes a <u>prima facie</u> case of disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date of June 1, 1998 through her date last insured of March 31, 2003. (Tr. at

12.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairment of vertebrogenic disorder.  (Tr. at 12-13.)  At the third inquiry, the ALJ concluded that Claimant's impairment does not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 13.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 13-16.)  As a result, through the date last insured, Claimant was unable to return to her past relevant work.  (Tr. at 16.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as clerk, survey interviewer, and telephone order clerk, which exist in significant numbers in the national economy.  (Tr. at 17.)  On this basis, benefits were denied.  (Tr. at 17-18.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

4

Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 38 years old at the time of the administrative hearing. (Tr. at 36.) She obtained a General Equivalency Diploma (GED) and did not require special education classes while in school. (Tr. at 37, 179.) In the past, she worked as a cashier and a stocker in retail stores and as a certified nursing assistant (CNA). (Tr. at 38-39, 53-54.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize Claimant's medical history between June 1, 1998 and March 31, 2003.

Physical Evidence

Records indicate Claimant was treated by Timothy G. Saxe, M.D., Internal Medicine practitioner, from May 15, 1997 to June 19, 2006. (Tr. at 270-325.) As previously noted, only those records

5

dated between June 1, 1998 and March 31, 2003 are relevant to the subject DIB claim.  During that time period, Dr. Saxe and his staff treated Claimant on 21 occasions.  Each of those office visits are summarized below. (Tr. at 284-316.)

On March 27, 1998, Bradley A. Nine, M.D., evaluated Claimant after noting that she was "normally seen by Dr. Saxe... Assessment: 1.  Headaches, ? migraine.  2.  Irregular menstrual bleeding. PLAN: 1.  I've given her a prescription for Imitrex injections.  2. I've given her a prescription for Ponstel for her menstrual cramps."  (Tr. at 318.)

On December 1, 1998, Dr. Saxe's Physician's Assistant - Certified ("PA-C"), Cynthia C. Campbell, reported:

> Chief Complaint: Pain in the neck from the ear to the throat...She was in a motor vehicle accident in 1991, and she hurt her neck at that time, and she has seen Dr. Davis who is a chiropractor who helps her with her back and neck...She is also complaining of severe dysmenorrhea...She states that her periods have been irregular ever since she had her tubes tied...

> IMPRESSION/PLAN: 1.  Lymphadenopathy [swelling of the lymph nodes] of the right anterior cervical chain.  We're going to start her on Biaxin 500 mg one p.o. b.i.d. for seven days... 2.  Dysmenorrhea [severe uterine pain during menstruation].  She is going to come in next week for her annual pap smear... 3.  The stiff neck.  If she is still having problems with her neck after treating the lymphadenopathy, we may try a muscle relaxant and an NSAID to see if this will help.

(Tr. at 316.)

On December 8, 1998, Ms. Campbell stated in an office visit note:

Chief Complaint: Needs pap smear and recheck of her lymph nodes...She is also complaining that she has constipation...She is also complaining of decreased energy, decreased sex drive, decreased concentration, and that she is very moody and irritable. Christina had started her on Zoloft in the past, but she was not compliant with the medication...We're going to start her on Paxil 10 mg a day for two weeks and then I want her to follow up, and we'll reevaluate her depression at that time...Patient was given a pamphlet on how to increase the fiber in her diet. I recommended CitruCel but patient refused.  We did a pap smear, and patient will be notified of her results.

(Tr. at 314-15.)

On Linda G. Brown, M.D., Pathologist, reported that Claimant's pap smear showed "benign cellular changes."  (Tr. at 312.)

On December 21, 1998, Dr. Saxe's PA-C, Ms. Campbell stated:

Follow up on depression...We had started her on Paxil 10 mg once a day...She states that she feels much better now that she is taking two of them later in the day because they kind of give her a hangover effect if she takes them close to bedtime.  She has more energy and feels that she can now enjoy life...She appears in no acute distress. She is smiling and appears to have a lot more energy than at the last visit.

IMPRESSION/PLAN: 1. Depression, stable.  We're going to continue the Paxil at 20 mg once a day.

(Tr. at 313.)

On July 28, 1999, Dr. Saxe's PA-C, Kelly P. Cummings, reported: "Patient presents with chief complaint of having a cat scratch and cat bite on her right knee and left forearm and left neck area...She assures me that the cat has received its rabies shots...We'll place her on Biaxin 500 mg b.i.d. for ten days." (Tr. at 311.)

7

On October 8, 1999, Dr. Saxe reported: "Dawn returns for two month follow up of her migraines and the knot on the back of her head...The Imitrex works extremely well to relieve her severe headaches...We'll CT scan her head...Recheck back after CT scan." (Tr. at 309.)

On October 26, 1999, Torin Walters, M.D. reported to Dr. Saxe regarding a CT scan of Claimant's head: "There is no extra-axial fluid collection, intraparenchymal hemorrhage or mass effect. Ventricles are normal. There is no acute bony abnormality or focal bony abnormality which would correlate with a palpable nodule." (Tr. at 308.)

On September 9, 1999, Ms. Campbell, reported that Claimant presented "complaining of severe headaches...Fenoprofen 600 mg...was refilled...Also, she was given five samples of Imitrex nasal spray and instructed on how to use these." (Tr. at 310.)

On January 7, 2000, Dr. Saxe reported:

> Dawn returns for two month follow up of her headaches and knot on her head. She's been having some sharp pains in her side. The headaches and the knot on her head are basically better...We'll send her for a CT scan of the abdomen and pelvis to rule out abscess, or other pathology in the right lower quadrant.

(Tr. at 307.)

On January 24, 2000, Ms. Campbell, evaluated Claimant: "IMPRESSION: 1. Right lower quadrant pain. 2. Cyst-like lesion of the scalp. 3. Migraines. 4. Lymphadenopathy of the neck...I'm going to have her follow up in the next two weeks for a

8

pap."  (Tr. at 306.)

On February 3, 2000, Ms. Campbell, stated:

Chief Complaint: Follow up for lymphadenopathy, place on
head, abdominal pain, and...presents today for her annual
pap and pelvic...She has a family history of lymphoma.
Her brother had it at the age of 23, and he is doing fine
now.  She is a smoker.  Has smoked about half a pack a
day for several years...She is also complaining of small
nodules on her spine, that she has had them for a long
time...She has had a tubal ligation.

(Tr. at 303.)

On February 21, 2000, Dr. Saxe's Certified Family Nurse

Practitioner ("CFNP"), Teresa Twohig, stated: "She presents today

with complaints of sore throat...Assessment: 1.    Pharyngitis

[inflammation of the throat]...Plan: 1.  Dynabac 250 mg two daily

for seven days."  (Tr. at 302.)

On May 24, 2000, Felix R. Muniz, M.D. reported in a progress

note copied to Dr. Saxe:

Ms. Childers comes today to the office to discuss further
options of treatment after a successful left diagnostic
medial branch block.  She reported excellent pain relief
for about four hours in the left lower back area...Today,
we are scheduling her for radiofrequency denervation of
the left lumbar medial branch nerve at L3/L4, L4/L5, and
L5/S1 levels.

(Tr. at 301.)

On July 10, 2000, Dr. Saxe reported in a progress note:

Dawn returns today for follow up...She had been to the
pain clinic.  They want to cut some nerves in her back
and she's not sure she wants to.  She saw Dr. Stevens who
said she had lymphadenopathy and not to do anything about
it...She goes back to see Dr. Muniz on the 17th.

IMPRESSION/PLAN: 1.  Chronic pain.  We will try her on

9

Neurontin 300 mg three times a day, gradually increasing the dose.  2.  Lymphadenopathy.  Stable.  She will follow up with Dr. Stevens.  3.  Recheck in three months.

(Tr. at 299.)

On September 6, 2000, Dr. Saxe reported:

Dawn returns today for one month follow up of her pain and lymphadenopathy.  Dr. Stevens said the lymph nodes are scar tissue...

IMPRESSION: 1.  Chronic pain.  Better on Neurontin. 2.  Lymphadenopathy.  Stable.  3.  Plantar corn.

(Tr. at 298.)

On September 27, 2000, Dr. Saxe reported:

Dawn presents today as an acute work-in.  The knot on the side of her head needs to be rechecked...She also states that she has fibrocystic breast disease and she's trying to watch her caffeine.  She is having problems with more depression around her periods, PMS.  We discussed increasing her Paxil to 40...

IMPRESSION: 1.  Knot on the side of head...  2.  PMS. 3.  Fibrocystic breast disease.  4.  Depression.

(Tr. at 297.)

On December 8, 2000, Dr. Saxe reported:

Dawn presents for follow up.  She still has the lump on her head.  It still causes her neck pain...She would like to have the knot cut out of her head and we will refer her to Dr. Morgan for this...She has a plantar wart on her right foot...
IMPRESSION:  1.  Telangiectases [red blotches on the skin].  Etiology uncertain... 2.  Lump on the head which is causing pain and spasm in the neck.  3.  Plantar wart. 4.  Fibrocystic breast disease.  4.  History of PMS and depression.

PLAN: 1. We will refer to Dr. Morgan to remove the lump on her head.  2.  We shaved the plantar wart. She will try banana peel on this to see if this helps.  3.  We will get blood work to find out the etiology of the

10

telangiectases.  4.  Recheck back in one month.
(Tr. at 295-96.)

On January 22, 2001, James H. Morgan, III, M.D., reported to
Dr. Saxe regarding his referral of Claimant's "lump on the head."
(Tr. at 294.) Dr. Morgan stated: "I don't feel it is something that
I could excise...I discussed the case with Dr. Saxe on the phone
today and we have decided to ask Dr. Weinsweig for his opinion."
Id.

On February 8, 2001, Dr. Saxe's CFNP, Diana Stotts, stated
that Claimant presented with chief complaints of a sinus infection
and back pain.  (Tr. at 292.)  Ms. Stotts prescribed Bactrim DS and
use of vaporizer for the sinusitis.  Id.  She also "conferred with
Dr. Saxe.  We are going to x ray her back and then she is to see
him in a month."  Id.

On March 5, 2001, Joseph W. Dransfeld, M.D., Barboursville
Radiology, Inc., interpreted Claimant's dorsal and lumbar spine x-
rays.  He concluded: "Dorsal spine: Studies of the dorsal vertebrae
show no bone or joint abnormality.  Lumbar spine: Studies of the
lumbosacral vertebrae show no bone or joint abnormality."  (Tr. at
248.)

On March 8, 2001, Dr. Saxe reported in a progress note:

Dawn returns for follow up.  Her body still hurts.  She
still has sinus drainage.  She wants to see a doctor for
allergy shots.  She sees the neurosurgeon on the
12th...The lymph nodes in her neck are basically
done...She has a lot of back pain...We discussed getting
her in physical therapy and seeing if this does not help.

11

Her depression is stable...

SPINE - The cervical spine is tight in the muscles radiating across the shoulders. There is no real decrease in motion...

IMPRESSION: 1. History of allergies. 2. Migraines. 3. C-spine pain and L-S spine pain. 4. Depression.

PLAN: 1. We will refer her to physical therapy. 2. Reviewed her x-rays and they were normal. 3. I had a note that they wanted to get a podiatrist see her to take off a plantar wart and this will be arranged. 4. Recheck back after being seen by the neurosurgeon.

(Tr. at 292.)

On July 13, 2001, Dr. Saxe reported:

Dawn presents today for follow up of her back pain and depression. She needs her physical therapy re-authorized...She states she is under a lot of anxiety causing her to itch...She picks at her skin. She has a lot of white places [that] do not tan, as well as the rest of her body and she is very upset. She wants some Nizoral cream for this...

SPINE - Spine appears to be normal today...

SKIN - She has a deep tan with multiple scars that do not tan.

IMPRESSION:
1. Back pain. 2. Depression. 3. Migraines. 4. Anxiety.

PLAN:
1. We will put her on BuSpar 15 mg twice a day. 2. We will refill her Neurontin and Fenoprofen.
3. Recheck back in three months.

(Tr. at 291.)

On October 1, 2001, Dr. Saxe reported:

Dawn returns for follow-up...She is doing well on her medicines...She told me that her physical therapist told her she should have an anti-inflammatory drug and a pain pill. We talked about adding a muscle relaxant as well

12

> as increasing her Fenoprofen...We also discussed increasing her BuSpar to t.i.d...
>
> IMPRESSION: 1. Viral infection of the throat. 2. Arthritis, non-specific. 3. Chronic pains. 4. Anxiety and depression.

(Tr. at 290.)

On October 5, 2001, David L. Weinsweig, M.D. reported in a letter to Dr. James Morgan with a copy to Dr. Saxe:

> I saw Ms. Childers in my office today. This is a 32-year old woman who rescheduled her appointment 5 times before coming in today. She comes in with a history of a couple of years of pain in the left suboccipital area...
>
> On examination, she was wide awake, alert and oriented. Her cranial nerve testing was normal...She was neurologically intact. Her motor strength, sensation, reflexes and coordination were fine.
>
> **Impression:** She has tenderness where the muscle attaches to the skull. I doubt there is anything serious here, but I have ordered an MRI of the brain for completeness sake, I will see her back after this is performed. I suspect to some degree she will have to learn to live with her discomfort.

(Tr. at 288.)

On November 13, 2001, Dr. Saxe wrote a letter "To whom it may concern" stating in its totality: "Dawn is a patient who has chronic pain and requires a TENS unit. While riding in airplanes she should be able to continue her TENS unit. If further information is needed, please contact me." (Tr. at 287.)

On July 12, 2002, Dr. Saxe stated:

> Dawn presents today for follow up. She is getting a lot of stiffness in her necks (sic), hands and knees. She is in therapy. She finds that muscle relaxants seem to work...She does take Fenoprofen only during her menstrual

13

cramps and this does seem to help.

Her mother was diagnosed with ALS and this is creating a
lot of stress.  She is off the Paxil .  She would like to
see if Celexa seems to help.  We will put her on Celexa,
Fenoprofen and also write her for some Flexeril because
this helps her as well...

IMPRESSION: 1.  Osteoarthritis.  2.  Depression.
3.  Symptoms of fibromyalgia.  4.  Possible bursitis.

(Tr. at 286.)

On August 15, 2002, Dr. Saxe's CFNP, Tammy King, noted:

Dawn saw Dr. Saxe last month.  She was having some
depression/anxiety symptoms.  He started her on Celexa.
She tells me she has tried other stuff in the past, but
this is the best she has felt in a long time.  She is
much calmer...She also has a bite [insect] on her arm
that she wants me to look at...Patient is alert and
oriented, in no acute distress...She is going to continue
her Celexa...Elocon cream to use on her insect
bite...follow up in three months.

(Tr. at 285.)

On November 13, 2002, Dr. Saxe's CFNP, Tammy King, noted:

I saw Dawn back in August.  She was on Celexa and doing
well.  She is upset because she has gained 17 lb. since
she went on it...She tells me the Celexa actually helped
her anxiety and depression, but she cannot stand to gain
anymore weight.  Is also wondering if she can have
something to help her sleep...

General - Patient is alert and oriented, in no acute
distress...

Diagnoses: 1. Weight gain. 2. Depression. 3. Anxiety.

(Tr. at 284.)

On June 25, 2007, a State agency medical source attempted to

complete a Physical Residual Functional Capacity Assessment and

concluded that there was "[i]nsufficient evidence prior to DLI

14

[date last insured]." (Tr. at 347-54, 352.)  The evaluator, Sheila Heston, stated:

> Medical records prior to DLI [3/31/2003] indicate treatment for depression, insect bites, weight gain, right elbow pain, and soreness of thumbs.  X-ray of lumbar and dorsal spine is normal.  Claimant had a laminectomy dated after DLI of 03/21/2003. Questionnaires were completed after which indicated constant pain and restricted ADL's [activities of daily living].  Evidence prior to DLI is insufficient.

(Tr. at 354.)

On August 27, 2007, A. Rafael Gomez, M.D. stated in a "Case Analysis" report: "I have reviewed all the evidence in file and the PFRC [Physical Residual Functional Capacity Assessment] of 06/25/07 is affirmed as written."  (Tr. at 393.)

On July 4, 2008, Robert Marshall, M.D. stated in a form titled "Medical Interrogatory Physical Impairment(s) - Adults; *In The Case Of*: Dawnn Sue Webb...June 1, 1998 through March 31, 2003; Alleged Onset Date: June 1, 1998" marked "No" to the question: Do any of the claimant's impairments established by the medical evidence, combined or separately, meet or equal any impairment described in the Listing of Impairments? and stated: "No physical [illegible] during this period for this allegation.  At that time the records do not indicate any reason for this other than [illegible] depression." (Tr. at 490-93.)  Dr. Marshall concluded:

> I find no evidence that she was physically disabled during the period in question.  I can't find that at any time from 98-03 she had a psychological evaluation.  It's not possible for me to declare whether her psychological problems would have prevented her from working.  My

15

conclusions refer only to her physical state.
(Tr. at 496.)

On October 23, 2008, Paul W. Craig II, M.D. completed a form titled "Medical Assessment of Ability to do Work-related Activities (Physical) for Claimant's representative. (Tr. at 499-501.) He concluded that Claimant could lift/carry less than 10 pounds; stand/walk 1-2 hours in an 8-hour workday; stand/walk less than 1 hour without interruptions; sit for 2-3 hours; sit 1 hour or less without interruptions; could never do any of the postural activities; could not do any of the physical functions except for reaching and pushing/pulling; and required all of the environmental restrictions due to her impairment. Id.

On October 28, 2008, Dr. Craig wrote in a single page report to Claimant's representative:

> Per your request I have examined the above claimant for a Social Security Capacity Evaluation...After a complete review of records presented at the time of evaluation, as well as a full medical history and completion of a physical evaluation the claimant's limitations are delineated below and in the attached form:
>
> 1. History of L5S1 spondylolisthesis with underlying degenerative disc disease and facet arthropathy ultimately requiring surgical fusion.
> 2. Ongoing chronic pain syndrome due to ongoing chronic severe low back pain, left leg pain and dysesthetic pain over the midline low back area. No radicular deficit or nerve root compression evident.
> 3. Sleep cycle disturbance secondary to chronic pain.
> 4. Required maintenance narcotic use with some daytime somnolence.
> 5. Claimant limited to sedentary activity levels and appears unable to reasonably or reliably work and

16

> [sic, an] 8 hour day, 5 days a week on a regular
> basis.
> 6.   Complaints of hand arthritis but no formal
>      diagnosis at the time of this visit.

(Tr. at 498.)

<u>Psychiatric Evidence</u>

On June 26, 2007, a State agency medical source completed a Psychiatric Review Technique form for the time period to March 31, 2003. (Tr. at 355-68.) The evaluator, Frank Roman, Ed. D., found Claimant's impairment was not severe regarding her affective disorder. (Tr. at 355.) He found Claimant had mild limitation regarding restriction of activities of daily living, difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 365.) He stated that the evidence does not establish the presence of "C" criteria. (Tr. at 366.) Dr. Roman concluded: "Based on MER claimant is credible and capable. Symptoms are consistent with history of depression. Overall, she is independent in her ADLs and able to follow routine work duties in a low stress setting." (Tr. at 367.)

On August 24, 2007, a State agency medical source completed a Psychiatric Review Technique form for the time period to March 31, 2003. (Tr. at 379-92.) The evaluator, Debra Lilly, P. D., found "[i]nsufficient evidence" prior to the date last insured of march 31, 2003. (Tr. at 379.) Dr. Lilly concluded: "This is a claimant with DLI several years ago. Although there is some medical

17

evidence in file, there is insufficient medical and functional information to adjudicate this time period." (Tr. at 391.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ erred in finding Claimant's medical condition to be "stable" rather than "debilitating" and failed to afford greater weight to the opinion of treating physician Timothy G. Saxe, M.D. dated June 19, 2006; (2) the ALJ erred in determining Claimant's mental illnesses were not severe enough to prevent her from working; (3) the ALJ erred in determining Claimant had the residual functional capacity to perform light work; (4) the ALJ erred in not affording Claimant full credibility; (5) the ALJ erred in stating that the transferability of job skills is not material because she is disabled under the Medical-Vocational Guidelines (grid rules); and (6) the ALJ erred in finding there were jobs Claimant could perform in the national economy. (Pl.'s Br. at 3-14.)

The Commissioner asserts that substantial evidence supports the ALJ's finding that Claimant was not disabled between June 1, 1998 and March 31, 2003. (Def.'s Br. at 4-10.)

<u>Medical Source Opinions</u>

Claimant first asserts that the ALJ erred in determining that "the record as a whole indicates an overall stable medical condition and does not support debilitating symptoms...The ALJ

18

should have afforded greater weight to [the] opinion of the Plaintiff's physician, Timothy G. Saxe, M.D." (Pl.'s Br. at 3-7.)

The Commissioner responds that Claimant's "claims have no merit because the evidence relating to the period from June 1, 1998 to March 31, 2003, confirms the accuracy of the ALJ's characterization of the evidence, step two finding, RFC assessment, and credibility finding...The clinical notes of Dr. Saxe...fail to demonstrate disabling limitations." (Tr. at 7-9.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. § 404.1527(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight is given to an examiner than to a non-examiner. Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Section 404.1527(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under § 404.1527(d)(2)(ii), the more knowledge a treating source

has about a claimant's impairment, the more weight will be given to the source's opinion.  Sections 404.1527(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

In evaluating the medical record of evidence for the relevant time period, June 1, 1998 to March 31, 2003, the ALJ made the following findings regarding Claimant's disabilities and the opinions of her treating physician, Dr. Saxe:

> The claimant alleged neck pain and low backache during the time in question from June 1, 1998 through March 31, 2003.  In March 2001 x-rays of the dorsal spine and lumbar spine were both within normal limits.  Her complaints of stiff neck seemed to be associated with her treatment for lymphadenopathy on the right side.  She did receive injections for this condition in 2000 and she was prescribed Neurontin for pain.  In July 2002 she reported stiffness in her joints and she was in therapy and taking muscle relaxants (Exhibits 1F and 5F)...
>
> The undersigned has examined the claimant's vertebrogenic disorder under listing 1.00.  The record does not reflect all of the positive neurological signs necessary to meet this listing.  The claimant had two negative x-rays and she did not have any MRIs or CT scans.  She did not receive treatment from a specialist and was not referred to a specialist. Her complaints for [sic, were] sporadic and in July 2002 she reported that therapy and muscle relaxants seem to help (Exhibit 5F).  The medical evidence shows that the claimant's problems mainly started in March 2006, which is after her date last insured.  Finally, the claimant does not equal in combination a listed impairment, even when taking into

20

consideration those impairments deemed not severe...

She started treated [sic, treatment] with Dr. Saxe in 1998...

The records from the office of Dr. Saxe and other sources, refer to many problems, including dysmenorrhea, neck pain, headaches (probably tension vs. migraine), skin eruptions, enlarged glands (no specific diagnosis) and lymphadenopathy on the right side. She was exposed to chemicals which made her lungs worse, but the predominant problems appears to have been depression with some anxiety. She was given prescriptions for a number of acute problems by Dr. Saxe or his office staff, including Paxil, Prozac, Zoloft (which did seem to help) and Celexa which helped but made her gained [sic, gain] weight. There was passing reference or two during 1998 to 2003 to low back ache, but this was not a major complaint. When Dr. Weinswig, neurosurgeon, saw her in 2001 it had nothing to do with her back but rather for evaluation of discomfort at the back of her head (no specific diagnosis). Her neurological exam was completely normal. Dr. Marshall went on the [sic, to] say that "I find no evidence that she was physically disabled during the time period in question. I can't find that at anytime from 1998 to 2003 she had a psychological evaluation....My conclusions refer only to her physical state" (Exhibit 27F). She testified that her worse problem during that time period was her back...

As for the opinion evidence, Dr. Saxe did not provide a functional capacity assessment (Exhibit 5F). The state agency found no impairments due to insufficient evidence prior to her date last insured (Exhibit 9F).

(Tr. at 12-16.)

The undersigned has thoroughly reviewed all the medical records, and finds that the ALJ fully considered Dr. Saxe's opinions, as well as those of the consultive examining physicians and the State agency record-reviewing medical sources of record, in keeping with the applicable regulations. The ALJ's decision reflects that he both considered and discussed the records of Dr.

Saxe and his staff regarding Claimant's medical care during the relevant time period. Claimant asserts that "[t]he record clearly supports Dr. Saxe's statement dated June 19, 2006." (Pl.'s Br. at 3.) The undersigned must assume that Claimant is referring to the progress note signed by Stephen D. Campbell, M.D., contained in records submitted by Dr. Saxe. (Tr. at 271.) This note states: "Patient is in today for follow-up. She wants to get a refill on her Neurontin. She had surgery with Dr. Ignatiadis on May 16, 2006. She said she's had significant improvement since this surgery. She says she is having half as much pain now than she did before." Id. Claimant is reminded that the relevant time period for this DIB claim is June 1, 1998 to March 31, 2003 and that the ALJ found: "The medical evidence shows that the claimant's problems mainly started in March 2006, which is after her date last insured." (Tr. at 13.)

Evaluation of Mental Impairment

Claimant next argues that the ALJ erred when he determined that her depression and anxiety were not severe enough to prevent her from working. (Pl.'s Br. at 7-8.) Specifically, Claimant asserts: "Plaintiff began complaining of depression in September of 2000...symptoms continued into 2002...medications did not relieve her symptoms completely because she continued to complain of symptoms...the Plaintiff's moderate mental illnesses should be deemed a non-severe impairment that nonetheless limits her ability

22

to work." Id.

The Commissioner responds that the ALJ appropriately addressed Claimant's mental impairments. (Def.'s Br. at 8-9.) Specifically, the Commissioner argues:

> Dr. Saxe treated Plaintiff's mental impairments exclusively with medication and did not refer her to a psychiatrist, psychologist, or counselor during the relevant time period (Tr. 282-313). Further, during the relevant time period Dr. Saxe commented that Plaintiff's depression was stable and that Plaintiff was doing well on Celexa, but changed her medication to Lexapro because the Celexa caused weight gain (Tr. 284, 292, 313). Plaintiff last saw Dr. Saxe during the relevant time period on November 12, 2002, and following that visit, Plaintiff did not return to Dr. Saxe for any treatment until February 10, 2004, which is ten months after her insured status expired (Tr. 282, 284).

Id.

The five-step sequential evaluation process applies to the evaluation of both physical and mental impairments. 20 C.F.R. § 404.1520a (a) (2010). In addition, when evaluating the severity of mental impairments, the Social Security Administration implements a "special technique," outlined at 20 C.F.R. § 404.1520a. Id. First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment. §§ 404.1520a(b)(1)(2010). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). §§ 404.1520a(b)(1) and (e)(2010). Third, the ALJ then must rate the degree of

functional limitation resulting from the impairment(s). §§ 404.1520a(b)(2)(2010). Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). §§ 404.1520a(c)(3)(2010). The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4)(2010). A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise. §§ 404.1520a(d)(1)(2010). Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2)(2010). Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity. §§ 404.1520a(d)(3)(2010). The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

§§ 404.1520a(e)(2) (2010).

In this case, the Claimant argues that the ALJ erred in concluding that her depression and anxiety were non-severe. (Pl.'s Br. at 7-8.) The court finds that the ALJ's decision reflects appropriate use of the "special technique," set forth above, to evaluate Claimant's mental impairments. (Tr. at 11-16.) In reaching his conclusion about the severity of those impairments, the ALJ considered Claimant's treatment history with Dr. Saxe and the findings of the State agency medical experts:

> In regards to depression, she was never hospitalized for a psychiatric condition and did not receive any out-patient treatment. Her only treatment was from her primary care physician and she reported that her medication helps with depression (Exhibit 5F). A second mental assessment at the reconsideration level found no mental impairments based on insufficient evidence prior to her date last insured (Exhibits 12F and 13F). Dr. Robert Marshall, a medical expert, noted no physical basis during the period from June 1, 1998 through March 31, 2003 because at that time the record did not indicate any reason for her allegations other than follow-ups for depression...Dr. Marshall went on the [sic, to] say that "I find no evidence that she was physically disabled during the time period in question. I can't find that at anytime from 1998 to 2003 she had a psychological evaluation. It's impossible for me to declare whether her psychological problems would have prevented her from working. My conclusions refer only to her physical state" (Exhibit 27F)...
>
> As for the opinion evidence, Dr. Saxe did not provide a functional capacity assessment (Exhibit 5F). The state agency found no impairments due to insufficient evidence prior to her date last insured (Exhibit 9F). All other functional capacity assessments were made after her date last insured is [sic] therefore insufficient evidence (Exhibits 24F, 25F, and 28F).

(Tr. at 14-16.)

Accordingly, the undersigned finds that substantial evidence

supports the ALJ's finding that Claimant's mental impairments were non-severe during the relevant time period.

<u>Credibility</u>

Claimant next argues that the ALJ erred in determining that Claimant was not fully credible. (Pl.'s Br. at 11-12.) Specifically, Claimant asserts that "her testimony is entitled to full credibility because her exertional and non-exertional impairments are disabling in nature...Furthermore, [her] testimony is consistent, because she continuously complained of her back pain when she visited her treating physician (Exhibit 5F)." <u>Id</u>.

The Commissioner responds that the evidence relating to the period from June 1, 1998 to March 31, 2003, confirms the accuracy of the ALJ's credibility finding. Specifically, the Commissioner asserts:

> Plaintiff acknowledged that prior to March 31, 2003, she drove without restrictions (Tr. 37). She also acknowledged that prior to March 31, 2003, she could walk a quarter of a mile, could stand for "three hours solid," had no difficulty using her hands, could lift between ten and fifteen pounds, and could sit for two or three hours at a time (Tr. 41). Additionally, she acknowledged that prior to March 31, 2003, she cooked, washed laundry, and shopped, as well as gardened when she could (Tr. 42).
>
> The clinical notes of Dr. Saxe, Plaintiff's primary care physician, also fail to demonstrate disabling limitations. As noted above, Dr. Saxe treated Plaintiff for both physical and mental impairments and did not mention functional limitations.

(Def.'s Br. at 7-8.)

Social Security Ruling 96-7p clarifies when the evaluation of

26

symptoms, including pain, under 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

> - The medical signs and laboratory findings;

> - Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

> - Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Regarding Claimant's credibility, the ALJ made extensive

27

findings:

I find the claimant is not fully credible.  I have given her the benefit of the doubt and have accepted some limitations based on her testimony; however, her testimony is very inconsistent and there is minimal objective evidence showing a basis for such extreme limitations.  During the time period in question, the state agency found no diagnosis as there was insufficient evidence prior to her date last insured (Exhibit 9F).  In regards to depression, she was never hospitalized for a psychiatric condition and did not receive any out-patient treatment.  Her only treatment was from her primary care physician and she reported that her medication helps with depression (Exhibit 5F).  A second mental assessment at the reconsideration level found no mental impairments based on insufficient evidence prior to her date last insured (Exhibits 12F and 13F).  Dr. Robert Marshall, a medical expert, noted no physical basis during the period from June 1, 1998 through March 31, 2003 because at that time the record did not indicate any reason for her allegations other than follow-ups for depression.  The records from the office of Dr. Saxe and other sources, refer to many problems, including dysmenorrhea, neck pain, headaches (probably tension vs. migraine), skin eruptions, enlarged glands (no specific diagnosis) and lymphadenopathy on the right side.  She was exposed to chemicals which made her lungs worse, but the predominant problems appears to have been depression with some anxiety.  She was given prescriptions for a number of acute problems by Dr. Saxe or his office staff, including Paxil, Prozac, Zoloft (which did seem to help) and Celexa which helped but made her gained [sic, gain] weight.  There was passing reference or two during 1998 to 2003 to low back ache, but this was not a major complaint.  When Dr. Weinswig, neurosurgeon, saw her in 2001 it had nothing to do with her back but rather for evaluation of discomfort at the back of her head (no specific diagnosis). Her neurological exam was completely normal.  Dr. Marshall went on the [sic, to] say that "I find no evidence that she was physically disabled during the time period in question.  I can't find that at anytime from 1998 to 2003 she had a psychological evaluation.  It's impossible for me to declare whether her psychological problems would have prevented her from working.  My conclusions refer only to her physical state" (Exhibit 27F).  She testified that her worse problem during that time was her back.  In May 2007 she reported that she

28

eats dinner at her in-laws every Sunday and does laundry
with help.  On good days she fixes a family dinner and
goes to the post office.  She takes care of her children
and husband and has no help with bathing, only with
fastening her bra.  She drives a car and is able to pay
her bills.  She watches television and reads.  She was
also able to fly from Houston, Texas to Yeager Airport in
Charleston, West Virginia and then she appeared in
Huntington, West Virginia for her hearing.  Accordingly,
I find that the claimant is not fully credible.

As for the opinion evidence, Dr. Saxe did not provide a
functional capacity assessment (Exhibit 5F).  The state
agency found no impairments due to insufficient evidence
prior to her date last insured (Exhibit 9F).  All other
functional capacity assessments were made after her date
last insured is [sic] therefore insufficient evidence
(Exhibits 24F, 25F, and 28F).

(Tr. at 15-16.)

With respect to Claimant's argument that the ALJ wrongfully
discredited Claimant's subjective complaints of pain, the
undersigned finds that the ALJ properly weighed Claimant's
subjective complaints of pain in keeping with the applicable
regulations, case law, and social security ruling ("SSR") and that
his findings are supported by substantial evidence.  20 C.F.R. §
404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig
v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  The ALJ's decision
contains a thorough consideration of Claimant's daily activities,
the location, duration, frequency, and intensity of Claimant's pain
and other symptoms, precipitating and aggravating factors,
Claimant's medication, and treatment other than medication.  (Tr.
at 15-16.)  The ALJ explained his reasons for finding Claimant not
entirely credible, including the objective findings, the

conservative nature of Claimant's treatment, and her broad range of self-reported daily activities.  Id.

RFC, Grid Rules, and Jobs in National Economy

Claimant next makes three arguments pertaining to steps four and five of the sequential evaluation process: (1) She asserts that the ALJ erred in finding that she had the residual functional capacity [RFC] to perform light work because her combination of impairments equals a listed impairment - "her tiredness would make it impossible to complete a full day's work...epidural injections should be sufficient to establish pain at a level that would prevent Plaintiff from working"; (2) She is disabled under Rule 201.17 of the Medical-Vocational Guidelines (grid rules), 20 C.F.R. Part 404, Subpart P, Appendix 2; and (3) The ALJ erred in finding that she can perform other work in the national economy.  (Pl.'s Br. at 9-10, 13-14).

The Commissioner responds that (1) the ALJ properly determined Claimant's RFC; (2) the grid rules claim has no merit because the grid rule requires that the claimant be illiterate or unable to communicate in English, and Claimant has stated that she obtained a GED and never required special education instruction and (3) the claim that she cannot perform other work in the national economy fails because Dr. Saxe's reports do not reveal disabling functional limitations during the relevant time period and what limitations Dr. Saxe may have suggested were incorporated into the ALJ's

30

hypothetical question to the vocational expert (Tr. 54).  (Def.'s Br. at 9.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.  20 C.F.R. § 404.1545(a) (2010).  "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)."  Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments."  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. § 404.1527(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not

31

> accept only physicians' opinions. In fact, if
> conflicting medical evidence is present, the
> SSA has the responsibility of resolving the
> conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations

omitted).

In the subject claim, the ALJ made extensive findings

regarding Claimant's RFC, the Medical-Vocational Guidelines (grid

rules), and whether Claimant can perform other work in the national

economy:

> After careful consideration of the entire record, the
> undersigned finds that, through the date last insured,
> the claimant had the RFC to perform light work as defined
> in 20 C.F.R. 404.1567(b) except sitting/standing two
> hours at a time throughout the day and no work at heights
> or around dangerous machinery.
>
> In making this finding, the undersigned has considered
> all symptoms and the extent to which these symptoms can
> reasonably be accepted as consistent with objective
> medical evidence and other evidence, based on the
> requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p.
> The undersigned has also considered opinion evidence in
> accordance with the requirements of 20 CFR 404.1527 and
> SSRs 96-2p, 96-5p, 96-6p and 06-3p...
>
> As for the opinion evidence, Dr. Saxe did not provide a
> functional capacity assessment (Exhibit 5F). The state
> agency found no impairments due to insufficient evidence
> prior to her date last insured (Exhibit 9F). All other
> functional capacity assessments were made after her date
> last insured is [sic] therefore insufficient evidence
> (Exhibits 24F, 25F, and 28F). In regard to Dr. Craig's
> assessment, I find it was not applicable as it is based
> solely on the claimant subjective complaints and not on
> objective medical evidence. Furthermore, Dr. Craig saw
> her on only one visit and there is no basis for extreme
> limitations based on the minimal medical evidence prior
> to 2003. Accordingly, I have given a lot of weight to
> Dr. Marshall and his conclusion is very thorough and
> persuasive as well as consistent with the weight of the

evidence for the time period of June 1, 1998 through
March 31, 2003...

The vocational expert testified that she could not
perform her past relevant work. Accordingly, I find the
claimant was unable to perform past relevant work...

The claimant has at least a high school education and is
able to communicate in English...

Transferability of job skills is not material to the
determination of disability because the Medical-
Vocational Rules as a framework supports a finding that
the claimant is "not disabled," whether or not the
claimant has transferable job skills (See SSR 82-41 and
20 CFR Part 404, Subpart P, Appendix 2)...

Through the date last insured, considering the claimant's
age, education, work experience, and RFC, there were jobs
that existed in significant numbers in the national
economy that the claimant could have performed (20 CFR
404.1569 and 404.1569a)...

Through the date last insured, if the claimant had the
RFC to perform the full range of light work, a finding of
"not disabled" would be directed by Medical-Vocational
Rule 202.21. However, the claimant's ability to perform
all or substantially all of the requirements of this
level of work was impeded by additional limitations. To
determine the extent to which these limitations erode the
unskilled light occupational base, through the date last
insured, the ALJ asked the vocational expert whether jobs
existed in the national and regional...economies for an
individual with the claimant's age, education, work
experience, and RFC.  The vocational expert testified
that given all of these factors the individual would have
been able to perform at the light level of exertions as
follows: clerical...and survey interviewer...Examples at
the sedentary level of exertion were provided as follows:
telephone order clerk...and clerical...Pursuant to SSR
00-4p, the vocational expert's testimony is consistent
with the information contained in the Dictionary of
Occupational Titles.

At the first hearing, Attorney Redd asked the vocational
expert to consider the claimant would miss work as
frequently as twice a month, would she be able to retain
employment.  The vocational expert testified that she

would not be able to maintain employment.  I reject this
assessment as it is based on the claimant's credible and
I do not find the claimant to be fully credible.

(Tr. at 13-17.)

"The Listing of Impairments describes, for each of the major
body systems, impairments that are considered severe enough to
prevent an adult from doing any gainful activity," see 20 C.F.R. §
404.1525(a)(2010), regardless of age, education or work experience,
see Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  "For a claimant
to qualify for benefits by showing that his unlisted impairment, or
combination of impairments, is 'equivalent' to a listed impairment,
he must present medical findings equal in severity to all the
criteria for the one most similar listed impairment."  See id. at
531.

With respect to Claimant's argument that the ALJ erred because
her combination of impairments equals a listed impairment, the
court finds this argument to be without merit.  Under the
regulations, it is Claimant's burden to prove that her condition
equals the criteria of one of the listed impairments.  In the
subject claim, Claimant has failed to meet this burden and the
undersigned finds that the ALJ generously determined Claimant's RFC
to be light with additional limitations, and even had the
vocational expert testify as to sedentary exertion level jobs that
Claimant would be able to perform. (Tr. at 54-55.)

Further, Claimant's grid rules claim has no merit because the

34

grid rule requires that the claimant be illiterate or unable to communicate in English.  20 C.F.R., Part 404, Subpt. P, App. 2, Rule 202.17 (2010).  Claimant testified that she obtained a GED. (Tr. at 37.)  Also, additional documentation shows that Claimant did not require special education instruction during her education and acquired a Certified Nursing Assistant (CNA) diploma. (Tr. at 53, 179.)  Claimant's assertion that she cannot perform other work in the national economy fails because the records of her treating physician, Dr. Saxe, do not demonstrate disabling functional limitations during the relevant DIB time period of June 1, 1998 through March 31, 2003.  (Tr. at 270-325.)  Also, any medical limitations Dr. Saxe may have suggested were incorporated into the ALJ's hypothetical question to the vocational expert. (Tr. 53-56.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: September 28, 2011

Mary E. Stanley
United States Magistrate Judge

35